HORACE BIRGE *v.* THOMAS G. NOCK.

Where a debtor fraudulently conveyed his real estate, and then procured a mortgage of it to be made by the grantee for his benefit, for much less than its value, and, for the fraudulent purpose of securing himself in the possession of it against his creditors, took a lease from the mortgagee, under which he retained possession, it was held, (independently of the question whether the mortgage was fraudulent,) that the debtor could not set up the title of the mortgagee and his own tenancy under it, against an action of ejectment brought by a trustee in insolvency, who had obtained a decree vesting the title in himself for the benefit of the creditors, subject to the rights, if any, of the mortgagee, who took his mortgage without notice during the pendency of the suit in equity and was not made a party to the suit.  ⌊One judge dissenting.⌋

The doctrine of *lis pendens* discussed on the argument, but not decided.

EJECTMENT, brought to the superior court in Hartford county ; tried on the general issue closed to the court before *Loomis, J.*  The court found the following facts.

On the 10th of February, 1854, the premises in question, situated in Windsor Locks, in Hartford county, with other land adjoining the same, were owned by George Benjamin, subject to a mortgage to Lucius B. Chapman for the sum of $350.  On that day Benjamin bargained to sell the lands to George Nock, subject to the mortgage, for $100.  George Nock paid Benjamin the price, and Benjamin on the same day at

his request conveyed the premises, subject to the mortgage, to George F. Nock, his minor son. On the 6th of December, 1856, Thomas G. Nock, another son of George Nock, paid Chapman the amount of the mortgage, and Chapman, by the request of George Nock and Thomas G. Nock, by a quit-claim deed, released the premises to George F. Nock. It was admitted that George F. Nock was possessed of no property by which he could have paid for the lands.

In the fall of 1856, Royal Prouty, in connection with Thomas G. Nock, who was his son-in-law, built a dwelling house on that portion of the land conveyed to George F. Nock, which constitutes the premises in dispute, and Thomas G. Nock immediately entered into the occupation of the dwelling house and has continued his occupation to the present time; but what proportion he and Prouty respectively contributed to the building of the house did not appear.

On the 25th of February, 1857, Thomas G. Nock executed and delivered to Prouty a quit-claim deed of all his interest in the land in question, which was then occupied by him. The consideration named in the deed was $1,300. At this time Thomas G. Nock was insolvent, and soon after failed in his business, and his debts, amounting to about $30,000, were compromised at 25 cents on the dollar, and Prouty gave his obligations, payable in six months from date, for this amount, which were accepted by the creditors of Thomas G. Nock. These obligations were never paid, and about the time they matured a trustee in insolvency was appointed on the estate of Prouty, who absconded.

On the 25th of May, 1857, Prouty and George F. Nock executed and delivered to Caroline Nock, wife of Thomas G. Nock and daughter of Prouty, a quit-claim deed of the premises in dispute. The consideration expressed in the deed was one dollar. Caroline Nock was possessed of no property prior to this conveyance to her, and Prouty was insolvent when he executed the conveyance.

On the 7th of October, 1857, the interest of Prouty in the premises was attached, on a writ in favor of A. & H. Birge against him, demanding $1,000 damages; and also on a writ

in favor of L. Burbank and others against him, demanding $2,000 damages ; and certificates of such attachments were recorded in the records of the town of Windsor Locks, by the town clerk, though the attachments were soon after abandoned and neither of the writs were ever · returned to the court to which they were made returnable. On the same day proper proceedings were instituted in the court of probate to procure the appointment of a trustee of the estate of Prouty as an insolvent debtor, under the insolvent laws of this state, and on the 17th day of October, 1857, Lucius B. Chapman was duly appointed by the court of probate trustee of his estate. Chapman, as such trustee, immediately demanded the premises in question from Thomas G. Nock and Caroline Nock, who were then occupying the same, as a part of the insolvent estate, and caused the premises to be inventoried as the property of Prouty ; but they refused to give up the premises, and on the 24th of October, 1857, they executed and delivered to Hiram Nott, of the city of New York, a warrantee deed of the premises. The consideration expressed in the deed was $2,450, and there was no other evidence in respect to it. Thomas G. Nock has ever since continued to occupy the premises. On the 25th of November, 1858, Chapman, as trustee, brought a bill in equity to the December term of the superior court in Hartford county, against Nott, to establish his title as trustee to the premises, on which bill an order of notice to Nott to appear and defend was duly made and complied with. Nott appeared by attorney and defended against the bill, and the same was continued from term to term until the March term, 1862.

On the 7th of October, 1858, Nott executed and delivered to George F. Nock a quit-claim deed of the premises. The consideration expressed in the deed was $2,500, and there was no other evidence in respect to the consideration. This deed was recorded in the records of lands in the town of Windsor Locks, on the 8th day of April, 1859. Chapman had no knowledge of the deed until it was recorded. About the 1st of April, 1860, and while the bill was pending, Thomas G. Nock applied to Philip Norton, of Berlin, in this state,

for a loan of $1000 upon the security of the premises in question, then stated to be owned by George F. Nock. Afterwards, on the 3d of April, 1860, Norton, in company with Thomas G. Nock and George F. Nock, went to the town-clerk's office in the town of Windsor Locks, to examine the records of lands as to the title. The records showed the various conveyances before mentioned, and also the attachments. Being informed that the attachments were of no consequence and that the writs had never been returned to court, he became satisfied that George F. Nock had a good title to the premises, and on the same day loaned the sum of $1000, taking as security therefor the joint note of Thomas G. Nock and George F. Nock, and a mortgage deed of the premises from George F. Nock to secure the same. Norton loaned this money in good faith and in the belief that the legal title to the premises was in George F. Nock, and he had no knowledge of the pendency of the bill in equity, and had no notice of any defect in the title of George F. Nock. His mortgage was duly recorded on the 3d day of April, 1860. The mortgage debt has never been paid, but is still due. Afterwards, at the March term of the superior court, 1862, Nott was defaulted in the suit in equity brought by Chapman as trustee, and a decree was passed declaring the conveyance to Nott to be fraudulent and void, and that the real interest in the premises was in Chapman as trustee, and vesting the legal title in him so far as the decree could be effectual for that purpose ; which decree was duly recorded in the records of lands in the town of Windsor Locks. It was agreed that after the decree had been passed, and before the commencement of the present suit, namely, on the 24th day of May, 1862, Norton agreed with Thomas G. Nock to hold and occupy the premises as his tenant under an agreement to pay him rent therefor and that Thomas G. Nock at the time the present suit was brought occupied, and has ever since occupied, the premises as tenant of Norton.

On the first day of July, 1862, Chapman, as trustee, by order of the court of probate sold at public auction all his

right and interest in the premises to the plaintiff, and conveyed the same to him by deed.

Afterwards Thomas G. Nock agreed with the plaintiff to pay the taxes assessed on the property, and if the plaintiff held the property the amount paid for taxes should apply towards the use of the premises by Nock, and the property has since been assessed in the name of the plaintiff, and the taxes assessed thereon paid by Nock.

On these facts the court rendered judgment for the defendant, and the plaintiff moved for a new trial.

*T. C. Perkins* and *Hyde*, in support of the motion.

1. The unrecorded deed from Hiram Nott to George F. Nock is wholly invalid and void as against Chapman, who commenced his petition in November, 1858, the deed not appearing until April, 1859. If the premises had actually been the property of Nott before he deeded to Nock, and they had been attached by Nott's creditors, or Nott had deeded to Chapman, the title thus procured would have been good as against the unrecorded deed to Nock. But Chapman was already the real owner, and in November commenced suit and took every step that the law has provided to perfect his title. It would be a reproach to the law if under these circumstances more effect should be given to the deed to Nock than it would have if Nott was endeavoring to convey the land in fraud of a valid deed from him to Nock.

2. The deed to George F. Nock, even if it had been recorded, would have been void as against Chapman, because it was fraudulent in fact. George F. Nock was one of the original parties to these fraudulent conveyances. He first held the title for Thomas G. Nock. He joined Prouty in the fraudulent conveyance to Caroline Nock. He was a brother of Thomas G. Nock, and must have known the fact of Prouty's insolvency, and that the property was claimed as a part of his estate. After he took the deed Thomas G. Nock continued to occupy the premises. It is not found that he paid Nott anything for the property, and when he mortgaged the property to Norton it was to secure a loan to Thomas G. Nock.

3. The deed to Nott was fraudulent and void. This not only appears from the facts found by the court, but was judicially determined in the suit brought by Chapman against Nott. This being so, Nott had no title which he could convey, and his deed to George F. Nock was void. *Preston* v. *Crofut*, 1 Conn., 527, 541.

4. Norton can claim no better title than George F. Nock had. If Nock's title was invalid because of his deed not being recorded when Chapman commenced suit against Nott, or because the deed to Nott was void under the decision in *Preston* v. *Crofut*, it is clear the objection would be equally fatal to Norton's claim. Besides, although it is found by the court that Norton "had no notice of any defect in the title of George F. Nock," this must be understood to refer to actual notice, as facts are found which should have put him on inquiry, and ought to be held equivalent to notice. The town records showed that the property had been attached as the property of Prouty. It does not appear that Norton made any inquiries as to the reason why the property was so attached, or why the writs were not returned, though the attaching plaintiff lived in the same town. The probate records showed the assignment to Chapman, and that this property was inventoried as a part of the assigned estate. The records of the superior court showed the pendency of the petition of Chapman for the title to this land.

5. Even if Norton had no notice of the prior fraudulent conveyances, the effect of the decree cannot be defeated by a conveyance made during the pendency of the suit. Willard's Equity, 251; *Diamond* v. *Lawrence County*, 37 Penn. S. R., 353, 356; *Meux* v. *Anthony*, 6 Eng. (Ark.), 411, 421; *Shotwell* v. *Lawson*, 30 Miss., 27; *Loomis* v. *Riley*, 24 Ill., 307, 309; *Inloes' Lessee* v. *Harvey*, 11 Maryl., 519, 524; *Gossom* v. *Donaldson*, 18 B. Monr., 230; *Harrington* v. *Slade*, 22 Barb., 161, 166; *Murray* v. *Ballou*, 1 Johns. Ch., 566, 577; *Bennet's Lessee* v. *Williams*, 5 Ohio, 462; *Lee* v. *Salinas*, 15 Texas, 495; *Jackson* v. *Andrews*, 7 Wend., 152. The claim of the defendant is, in substance, that though it is true that he has procured the various fraudulent conveyances set forth

in the finding of the court to be made, to enable himself to retain the property in fraud of his own and Prouty's creditors, and by means of those conveyances has successfully baffled their efforts to obtain possession of it for the last eight years; and although those creditors have procured a decree in the superior court, setting those conveyances aside, and vesting the title in Chapman, their trustee, yet the court ought not to deprive him of possession now, because he says he has succeeded in defrauding another party, Norton, and has induced him, by deceiving him as to the title, to lend him $1,000 on the security of his fraudulent title; and that Norton is willing to let him continue his occupancy and enjoy the fruits of his fraud.

*C. Chapman* and *McFarland*, contra.

1. On the 3d day of April, 1860, the legal title to the premises in controversy was vested in George F. Nock by the following conveyances:—On the 10th of February, 1854, Benjamin conveyed to him, subject to a mortgage to Chapman, which mortgage was released to him by Chapman in 1856. On the 25th of May, 1857, Prouty, who had no title, and George F. Nock, who had the title, joined in a release to Caroline Nock. On the 24th of October, 1857, Caroline, and Thomas G. Nock her husband, conveyed the premises to Hiram Nott, for the expressed consideration of $2,450, which is presumptively the true consideration, as there was no other evidence in relation to it. On the 7th of October, 1858, Nott conveyed the premises to George F. Nock, for the expressed consideration of $2,500, who thus became again the owner of the premises. The consideration expressed in this deed is presumptively the true consideration. On the 3d of April, 1860, George F. Nock conveyed the premises by way of mortgage to Philip Norton, who is the real defendant, the suit being against his tenant. Norton is found to have been a *bona fide* purchaser for a valuable consideration, without notice of any infirmity in the title, if any existed. The title thus obtained by Norton the plaintiff seeks to overthrow. He claims a superior title under a deed from Lucius B. Chap-

Birge v. Nock.

man, as trustee in insolvency of Prouty. But we submit that, upon the facts found, Prouty never had any title that could be asserted in a court of law as against any one, and especially against Norton. It is immaterial that George and Thomas G. Nock paid the purchase money to Benjamin and Chapman. Their creditors are not before the court, and none but their creditors could raise any legal objection to their doing so. And Norton is a *bona fide* purchaser for value, without notice, and could not therefore be affected by that circumstance. And it is immaterial that Thomas G. Nock executed a deed to Prouty, inasmuch as he never had a legal title to convey. He may have had, as between himself and George F. Nock, an equitable interest, but it could not be the subject of a legal conveyance. It is also immaterial that Prouty contributed something to the erection of a house on the premises, and it would be equally immaterial if the amount of his contribution had been found. Such an interest would be, not a legal, but an equitable interest, and could only be reached by proceedings in equity. And such a circumstance could not in any case affect the title of a *bona fide* purchaser.

2. The decree of the superior court, entered upon default in the suit brought by Chapman against Nott, did not *proprio vigore* vest the legal title to the premises in Chapman as against the defendant Norton. This point is settled by the case of *King* v. *Bill*, 28 Conn., 593. It did not become necessary in that case to decide how far a court of equity would regard the *lis pendens* as affecting the title of a *bona fide* purchaser for value; but the court intimate very strongly that it would not be allowed to impair his title. Certain points were however settled by that case, which are quite decisive of the case at bar. It was decided that a title obtained by a decree founded upon the statute does not relate back to the commencement of the suit, but that the decree passes only such title as the defendant has at the time the decree is rendered. Also that a deed executed *pendente lite* would pass the legal title to the grantee, and that at all events in a court of law the title thus acquired would not be impaired

or affected by the subsequent decree. Inasmuch then as Nott did transfer the legal title to the premises in question to George F. Nock, and Nock transferred it to Norton before the decree was rendered, we are protected by this decision against any title obtained by the plaintiff under it. *Bishop of Winchester* v. *Paine,* 11 Vesey, 199; *L'Estrange* v. *Robinson,* 1 Hogan, 202. A case could not be presented which would better illustrate the gross injustice that a different doctrine would lead to. And this in itself is the best vindication of the decision. It is shown that the insolvent Prouty never had any title, so that if the decree transferred only the title of Prouty it would have transferred no title at all. The plaintiff could not even prove that Prouty had contributed any particular sum to the erection of the house, even if this would have availed him. So that it does not appear that Prouty ever had any interest in the premises that could be enforced either in a court of law or equity. Norton, on the contrary, is a *bona fide* purchaser for value, who took his security on the faith of the public records, to which and to which alone the laws of this state have always directed the citizen in order to ascertain the title to land, and told him that he might safely rely upon the title as therein disclosed. If then this plaintiff recovered it would be solely because of the technical legal effect of this decree taken on default in a suit to which Norton was not a party, of which he had no notice, and in which he could not be heard in defense of his rights. Such a doctrine would unsettle the foundations of our registry system and destroy its usefulness.

It is unnecessary to say anything here in respect to the doctrine of *lis pendens,* for it is not involved in the case; but so far as it relates to litigation respecting the title to land, it is obvious upon a moment's reflection that it is not at all adapted to our laws or our policy. If any thing in our public policy can be considered as settled it is this, that the title to lands shall be a matter of public record. In this respect our policy is and always has been radically different from that of England, where the doctrine had its origin. There the covenant of warranty with the possession of the title deeds

is the purchaser's chief reliance and protection. Here our main reliance is on our public records, and we have been taught to look to these as the only reliable guide in obtaining a title to real estate. If however, as our courts are constituted, the title was to be subject to the results of a *lis pendens*, a purchaser, even by searching the records of all the courts, could have no assurance that he was obtaining a title, for under our law a suit is commenced from the time of the service of process, and before it is returned. So that if the seller saw fit to conceal the fact that he had been sued the purchaser would be remediless. If a petitioner desires to prevent a conveyance *pendente lite* he has only to take an injunction for that purpose, and he is then reasonably secure.

CARPENTER, J. It has been judicially determined that the deed from Thomas G. Nock and wife to Hiram Nott, dated October 24th, 1857, was fraudulent and void as against the creditors of Royal Prouty. The question of fraud then in respect to that deed is no longer an open one. It is not expressly found that the deed from Nott to George F. Nock, dated October 7th, 1858, was fraudulent; but we think the facts found are equivalent to that, and clearly show that it was given in pursuance of the same fraudulent design, and therefore void. · So also was the mortgage deed from George F. Nock to Philip Norton, at least so far as this defendant is concerned. That he negotiated the loan to secure which the mortgage was given, and signed the note as a joint maker thereof, is expressly found. That he had the avails thereof is fairly inferable, as it no where appears that George F. Nock ever had any real interest in the premises. That he was a party to all this fraud, if not the principal instigator thereof, the history of this case abundantly proves. He now seeks to avail himself of all the advantages intended to be derived from such fraud, and retain the possession of the property, which he has thus far succeeded in withholding from his own and Prouty's creditors. He attempts to do this by setting up, as a defense to this action, the interest of Philip

Norton in the premises as mortgagee, and a lease from Norton to himself.

The mortgage debt was originally one thousand dollars. The value of the property mortgaged is not directly found, but it would seem to be at least double the amount of the mortgage debt ; so that there is an interest outstanding in some one equal to or greater than that of the mortgagee, admitting that his mortgage is a valid one.

The decree of the superior court vested the absolute title to the property in Lucius B. Chapman, as trustee, subject only to such rights as Norton acquired by his mortgage. If that mortgage was invalid the trustee took the absolute fee, and the plaintiff's right to recover cannot be questioned. If it is valid, the title vested subject to the mortgage, and the plaintiff must now be regarded as the owner of the equity of redemption. Upon that assumption the plaintiff stands upon the footing of a mortgagor after the expiration of the law day and while the mortgage is still outstanding. That a mortgagor cannot maintain ejectment against the mortgagee under such circumstances is well settled. The same rule applies to an assignee, or other party who in good faith claims title under the mortgagee. But a stranger, who has no interest in the debt or land, cannot set up an outstanding mortgage as a defense to an action of ejectment brought by the mortgagor. *Porter* v. *Seeley*, 13 Conn., 564. As between such parties the legal title of the plaintiff is complete notwithstanding the mortgage.

It being established that a mortgagor may, under some circumstances, recover the possession of the mortgaged premises in an action of ejectment against a stranger, while the legal title is still outstanding in the mortgagee, let us next inquire whether this defendant sustains such a relation to the subject matter in dispute as that this plaintiff ought not to recover.

The design of the mortgage to Philip Norton was, as we have already seen, a fraudulent one on the part of the defendant and George F. Nock. The object was to avoid the debts of the defendant, and the debts of Royal Prouty, which

to some extent were identical. The plaintiff succeeds to the rights and stands in the place of the creditors whose debts are sought to be avoided. The defendant is himself the principal party to the fraud. As between these parties the statute against fraudulent conveyances declares the mortgage to be "utterly void." It follows therefore that the defendant is not in a situation to avail himself of a conveyance procured by his own fraud, especially when he attempts to do so in furtherance of his fraudulent purpose.

But there exists between Norton and the defendant the relation of landlord and tenant; and it may be said that the possession of the tenant is the possession of the landlord, and that a judgment against a tenant is equivalent to a judgment against a landlord on account of the privity existing between them. This may be so as a general rule, but we think this case is an exception to the rule. The tenancy was a fraudulent one. The design was, not to protect the interest of the mortgagee, but to place the defendant in a situation to retain, so to speak, the possession of the equity of redemption. The defendant was in possession as real owner, the record title being in a third party. Pending a suit for the legal title by creditors, a mortgage is given to secure a debt of less than half the value of the property. The mortgagor thereupon nominally surrenders the possession to the mortgagee, and immediately takes a lease from him, by which he retains the possession of the property as before. It is not usual for a mortgagee, when his debt is abundantly secured, to take immediate possession of the property mortgaged. The design of a mortgage is to secure a debt, and it is treated as security merely, both in law and equity. Generally the mortgagor remains in possession, being regarded as real owner for most purposes, until the mortgagee finds it necessary, for the security of his debt, to take possession. This is usually done in connection with a petition for a foreclosure; and the ordinary practice is for the court, in the action of ejectment, to stay execution until the decree of foreclosure becomes absolute. When therefore the mortgagor, at the inception of the mortgage, goes through the formality of giving possession to the mort-

gagee, and immediately takes a lease from him, thus leaving the actual visible possession precisely as it was before, and precisely as the law would have left it without this formality, we naturally look upon the transaction with suspicion, to say the least. And when surrounded with circumstances similar to those surrounding the one now under consideration, we have no hesitation in declaring it fraudulent. We must therefore regard this lease as a part of a series of fraudulent acts, by which the defendant is attempting to place his property beyond the reach of creditors, and as such it is void as against such creditors.

If we are right in this view of the case, neither the mortgage nor the lease, nor the two combined, will constitute a defense to this action, unless it becomes necessary so to hold in order to protect the interests of the mortgagee.

We do not intend to decide upon the validity of Norton's mortgage. We have therefore purposely avoided expressing any opinion upon that question. But we have assumed, for the purposes of this case, that it was valid. Assuming that, and the result of our decision is merely to take the equity of redemption out of the hands of the fraudulent mortgagor, and place it where it rightfully belongs, at the disposal of his creditors, leaving the mortgagee to all the rights, whatever they are, which he legitimately acquired by his mortgage. By doing so we cannot see that we do him any essential harm, or impair in the least the extent of his security; while on the other hand, if we leave the property in the defendant's possession, we not only countenance the fraud, but aid him in its consummation, and secure to him, partially at least, the fruits of it, besides delaying and hindering the creditors.

For these reasons we think the superior court erred in rendering judgment for the defendant.

A new trial must be granted.

In this opinion the other Judges concurred; except Mc-Curdy, J., who dissented.